1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| DAVID C. CORSER, | 1:05-CV-00985 OWW DLB |
|---|---|
| Plaintiff, | ORDER RE MOTIONS FOR SUMMARY JUDGMENT FILED BY LARRY GONZALES (DOC. 101), MARIA GONZALES (DOC. 100), AND THE COUNTY OF MERCED, *ET AL.*, (DOC. 107). |
| v. | |
| COUNTY OF MERCED, *et al*. | |
| Defendants. | |

## I.   INTRODUCTION

Plaintiff David Corser ("Plaintiff" or "Corser") brings this
suit pursuant to Title 42, Section 1983, of the United States
Code, alleging that he was a victim of:  (1) retaliation for
exercising his First Amendment rights; (2) unlawful arrest and
excessive force; and (3) a conspiracy to violate his
constitutional rights.  He also brings supplemental claims under
state law: assault, battery, and the use of excessive force in
effecting his arrest; false arrest and false imprisonment;
violations of his constitutional rights for which liability can
be imposed pursuant to Section 52.1 of the California Civil Code;
and negligent training and supervision.

Before the court for decision are three separate motions for

1

1  summary judgment filed by (a) Defendant Larry Gonzales,

2  (b) Defendant Maria Gonzales, and (c) the County of Merced

3  ("County") and various officers and employees of the County.

4

5                          III.  <u>BACKGROUND</u>[1]

6       The events in this case took place in the small town of

7  Planada, located within Merced County, California.  The County

8  operates a Community Center in Planada within a County Park.

9  County's Statement of Undisputed Facts ("CSUF") #2.  Starting in

10 approximately 1994, the Planada Community Action Board ("PCAB"),

11 a local citizens organization, leased the Planada Community

12 Center from the County.

13      A separate, private, citizens organization, the Planada

14 Community Development Corporation ("PCDC") operated an after-

15 school program for kids in the Planada Community Center.  In late

16 2003, Plaintiff was hired as "senior coordinator" for the PCDC

17 after-school program.  CSUF #9.  The PCDC is a nonprofit

18 corporation with a Board of Directors.  The record does not

19 reveal a complete PCDC Board roster for the relevant time period,

20 but it appears to be undisputed that Defendants Larry Gonzales,

21

22  _____

23      [1]   As a threshold matter, Plaintiff objects generally to
    "every exhibit" submitted in support of the County's motion for
24  summary judgment, as the Declaration of Michael Mason, to which
    these documents were attached, was not made under the penalty of
25  perjury.  *See* Docs. 165 and 108.  There is no dispute as to the
    authenticity, completeness, or content of the documents, most of
26  which are excerpts from deposition transcripts taken in this
    case.  Mr. Mason's inadvertent failure to submit the documents
27  under the penalty of perjury is not a basis for their exclusion.
    Plaintiffs' objection is OVERRULED.
28

                                2

1  Ruth Stone, and possibly Maria Gonzales, as well as several
2  friends and associates of Plaintiff, including Kathleen Lopez and
3  Bryant Owens, were members of the PCDC Board during the relevant
4  time period.[2]

5       During the relevant time period, Defendant Gloria Keene was
6  the Merced County Supervisor representing the Planada area.
7  Keene was a founding member of the PCDC.  CSUF #11.  In 2003,
8  Keene helped the PCDC obtain grant funding for the after-school
9  program through the nonprofit organization "Save the Children."
10 CSUF #13.

11

12      A.   PCDC's Use of the Community Center.

13      The County asserts that it never approved of the PCDC's use
14 of the Community Center, and, upon learning of the arrangement,
15 became concerned because it did not know who was running the
16 program, whether its operators were permitted to run an after-
17 school program, and/or whether insurance would protect the
18 County.  CSUF #6.  The County expressed its concerns to the PCAB,
19 but claims it made no attempt to evict the after-school program.
20 CSUF #7.

21      Plaintiff maintains that the County was aware of PCDC's use
22 of the Building and the existence of the after-school program,
23 pointing to evidence indicating that Supervisor Keene was present

24

25 _____

26    [2]   Plaintiff's roommate, Jesus Colmenero, was also a
   member of the PCDC Board in August 2002.  Defendants asserted
27 during oral argument that Colmenero was no longer a member of the
   board as of 2004, but present no evidence concerning his removal
28 or departure.

1  during meetings where the PCDC's use of the Community Center was

2  discussed as early as 2002, Pltf's Ex. 1007 (PCDC Board Meeting

3  Minutes for Aug. 12, 2002), and other evidence indicating that

4  the County gave the PCDC pre-clearance for the after-school

5  Program as early as 2002, *see, e.g.*, Pltf's Exs. 1006 (Memorandum

6  of Understanding between the Merced County Community Action

7  Agency and the PCDC, dated Oct. 17, 2002, permitting the use by

8  PCDC of the Community Center for after-school programs).

9       At some point in 2004, Paul Fillebrown, the Director of the

10 County's Public Works Department, received a letter from the PCDC

11 requesting that it be allowed to lease the community facility.

12 CSUF #15.  Public Works Department staff met with representatives

13 of both PDCD and PCAB to discuss use of the building.  CSUF #17.

14

15       B.   January 2004 Planada Association Lawsuit.

16       In January 2004, the San Joaquin Raptor/Wildlife Rescue

17 Center and the Planada Association, of which Plaintiff, Kathleen

18 Lopez, and Bryant Owens were members, filed suit against the

19 County of Merced challenging the environmental review, or lack

20 thereof, of the Planada Specific Plan under the California

21 Environmental Quality Act ("CEQA").  PSUF #1.[3]

22

23       [3]   Plaintiff submits Exhibit 1016, a cost analysis

24 produced by Defendant Demitrios Tatum, which appears to be a log
   of the amount of time spent by local government personnel

25 complying with requests for information from citizens groups.
   For each request, there is an entry for the amount of time

26 allocated for the project and an entry for the amount of time
   actually spent on the project.  There are two entries, dated

27 January 27, 2004, for requests made by "SJ Raptor Rescue Center,

28 Protect Our Water, etc.," which indicate that one hour was

                                 4

1

2          C.   <u>May 6, 2004 MAC Meeting.</u>

3       On May 6, 2004, Ruth Stone presided over a meeting of yet

4  another organization, the Planada Municipal Advisory Committee

5  (hereinafter "MAC") held at the Planada Community Center.

6  Defendants indicated at oral argument that, unlike the PCAB and

7  PCDC, members of the MAC are appointed by the County to advise

8  the County on land use issues.  Larry Gonzales was also a member

9  of the MAC.  Gonzales Depo. at 94.  Prior to the meeting, Stone

10 received a telephone call from Corser asking if he could add an

11 item to the MAC's May 6, 2004, agenda.  CSUF # 18.  She advised

12 him that the agenda had already been completed and mailed.  Stone

13 states that Corser made no further comment about the agenda.

14 CSUF #19.[4]

15      Stone arrived for the May 6, 2004 meeting to find that

16 Corser and others had relocated the MAC meeting to a larger room

17 in the Planada Community Center and had set up recording devices.

18 CSUF #20, 21.  Stone objected to the recording devices,  but

19

20 allocated for each of the two requests, but more than sixteen

21 hours was actually spent complying with the requests.  Plaintiff
   characterizes this document as evidence that "Demitrios Tatum

22 began investigating the cost to local government associated with

23 certain activists...."  Doc. 142 at 2.  Plaintiff fails to
   explain why there is anything improper or unlawful about a local

24 government keeping track of how much time staff spends responding

25 to requests for information.

26      [4]   Corser disputes Stone's assertion that she refused to
   allow him to add an item to the agenda because it had already

27 been completed and mailed, pointing to pages 427 and 428 of his
   deposition, but nothing on those pages refutes her assertions

28 regarding the agenda.

1  Supervisor Keene informed her that California's Brown Act
2  permitted such recording.  CSUF #22.

3      Stone was confronted with a large number of people wanting
4  to speak at the meeting, but decided to defer visitor comment
5  until agendized matters had been concluded.  CSUF #23.  It is
6  estimated that some 60-80 people were present at the meeting,
7  hoping to speak on behalf of the after-school program.  CSUF #24.
8  It was unusual for so many people to attend the committee
9  meetings.  CSUF #25.

10     Early in the program, Corser approached the microphone and
11 was asked by Ms. Stone to wait, which he refused to do.  He was
12 persuaded by others in his group to relinquish the microphone.
13 CSUF #26.  Supervisor Keene made her report to the Board and
14 then, as was her practice, left the meeting.  CSUF #27, 28.  Upon
15 leaving the meeting, Keene states that she went home and called
16 the County Chief Executive Officer, Demetrios Tatum, to express
17 her concern that Ruth Stone was having a difficult time with the
18 meeting.  CSUF #29.  Specifically, Keene was concerned that Stone
19 had lost control of the meeting.  CSUF #31.[5]

20     Tatum acknowledges that he received a telephone call from
21 Keene on May 6 regarding Keene's concern that there was a problem
22 at the meeting.  Tatum recalls that Keene tried to reach Sheriff
23 Mark Pazin with her concerns, but called Tatum when she could not
24 get through to Pazin.  Tatum Depo. at 15-17.  Tatum then called

25

26     [5]    The County asserts that Keene was concerned because
27 Stone began yelling at people in the audience.  CSUF #30, 31.
   Corser disputes this, stating that there was no yelling and
28 screaming during the meeting.  Corser Decl. at ¶14.

                              6

1  Sheriff Pazin to relay Keene's concerns about a disturbance at

2  the meeting.  CSUF #33.  Pazin dispatched a deputy to the

3  meeting.  CSUF #34.

4      Deputy Ralph Zyskowski recalls being dispatched to the

5  center on May 6, 2004.  CSUF #36.  Upon arriving, he did not see

6  anything outside, nor did he observe a disturbance inside.  CSUF

7  #37.  Zyskowski recalls the street being congested with cars, so

8  he drove his vehicle onto the sidewalk to park it near the

9  building.  CSUF #39.  At least one other witness recalls

10 Zyskowski screeching his brakes and driving his car up onto the

11 grass with his lights shining on the building, and called the

12 arrival "dramatic" and "inappropriate."  Lopez Depo. at 108-109.

13 Another witness recalls Zyskowski entering the meeting room with

14 his baton drawn, inquiring as to the location of the disturbance.

15 Owens Depo. at 107-08.

16     A second officer, Deputy Parrish, was dispatched to the

17 center as well.  Parrish recalls that when he arrived, everyone

18 was gone, and that he did not enter the building.  CSUF #49, 50.

19 Corser disputes this, stating that Parrish did enter the

20 Community Center when he and other members of the public were

21 present.  Corser Decl. at ¶16.

22     Corser claims that he was intimidated by the arrival of

23 Deputies Parrish and Zyskowski.  CSUF #48.  Corser sent a letter

24 to Sheriff Blake complaining about the presence of the officers

25 at the MAC meeting.  Corser Decl. at ¶15.  Sheriff Blake informed

26 Corser that he spoke with the individuals involved about the

27 complaint.  *Id.*

28

7

1

    D.    **The Promise of County Help for the PCDC.**

2    During this general time period, Keene identified a grant

3  for economic development for the PCDC, but it was contingent upon

4  the requesting entity having a business office.   CSUF #51.

5  Plaintiff points to statements made by Larry Gonzales in answers

6  to interrogatories propounded by Bryant Owens in a state case,

7  *Bryant Owens v. Larry Gonzales, et al.*, Case No. 147956, filed in

8  Merced County Superior Court.   Pltf's Ex. 1002.   In those

9  answers, Gonzales stated that Keene told him about the $50,000

10  grant, but felt she could not work with two current members of

11  the PCDC Board, Katie Lopez or Bryant Owens.   Gonzales believed

12  that Keene would only help the PCDC go after the grant if there

13  "was someone representing the corporation with whom she felt she

14  could work."  *Id*. at Response #8.   Mr. Gonzales also testified at

15  his deposition that he spoke with a County employee named "Mike",

16  who indicated that the County would be willing to work with PCDC

17  to resolve its need for a space within which to run its programs,

18  but only if the PDCD board was made up of people who would not

19  "bully people around," "talk about supervisors," or file

20  "lawsuits against the sheriff's association."   L. Gonzales Depo.

21  at 146.[6]

22

23        [6]    The County objects that these statements are hearsay as
24  to the County.   Gloria Keene is a party opponent, so the
    statements are not hearsay as to her, but no evidence and/or
25  authority has been given to attribute Ms. Keene's speech to the
    County or that the County had any policy relevant to Plaintiff's
26  allegations.   As to the statement made by "Mike," it is also
    hearsay as to the County because it has not been established that
27  Mike speaks on behalf of the County.   The County's objections are
28  SUSTAINED.

Gonzales believed Katie Lopez and Bryant Owens were not people Keene or the County would work with.  Initially, Gonzales did not view Plaintiff in this light, but later began to group Corser with Lopez and Owens.  *Id*. at 146-47.  However, there is no evidence in the record indicating that Keene, Mike, or any other County official or employee discussed Corser with Gonzales or in any way indicated that they wanted Corser removed from his position.

Plaintiff also claims that Ruth Stone told him that she was extremely bothered by Bryant Owens and that anyone associated with Bryant Owens was "going down."  CSUF #60.  Stone specifically denies having said such things to Corser.  CSUF #61.

E.   <u>Attempted Removal of Bryant Owens and Katie Lopez from the Board.</u>

On June 17, 2004, Larry Gonzales attempted to have the PCDC Board remove Bryant Owens and Katie Lopez as members.  CSUF #56.  Katie Lopez disputes the propriety of the procedures followed by Gonzales that night and asserts that she and Owens were never properly voted off the board.  CSUF #63.

Katie Lopez also believes that Larry Gonzales attempted to use Merced County Sheriff's Deputies to intimidate members of the PCDC at this meeting.  Lopez Depo. at 36-38.

Corser recalls that on this date, Maria Gonzales, Larry Gonzales' wife, told Plaintiff that Bryant Owens and Katie Lopez had been "taken care of" and that Plaintiff would be "next to

9

1  go."  Corser Depo. at 464.[7]

2

3  **F.   Request by Certain Members of the PCDC Board that**
4  **Plaintiff Take Time Off.**

5  Alicia Rodriguez, another member of the PCDC Board asserts

6  that on the on the same date, the PCDC Board requested that David

7  Corser take time off due to "inappropriate behavior."  He did not

8  oblige.  CSUF #65.  Among other things, witnesses state that

9  Corser contended there was a conspiracy going on and that he and

10  others were being watched by the FBI.  CSUF #64.  Corser denies

11  that he was acting erratically or that he was asked to take time

12  off.  Corser Decl. at ¶4.

13

14  **G.   County Recommends Leasing the Community Center to the**
    **PCAB not the PCDC.**

15  On June 22, 2004, Fillebrown reported to the County Board of

16  Supervisors that the staff recommended the lease be renewed with

17  the PCAB, not the PCDC, because the after-school program

18  conflicted with community use and the PCAB was more financially

19  stable than the PCDC.  CSUF #69.  On June 22 the Board of

20  Supervisors approved a lease with the PCAB.  CSUF #71.

21

22  _____

23  [7]   In an example of one of the numerous, inappropriate
    evidentiary objections raised in these papers, Larry Gonzales
24  asserts that Corser's recollection of what Maria Gonzales said to
    him is inadmissible hearsay and is "irrelevant to any of the
25  issues or claims against defendant Larry Gonzales."  Doc. 159-2
    at 8.  This evidence is not barred by the rule against hearsay.
26  Plaintiff is competent to testify about statements made directly
    to him.  The statements are also relevant to the existence of a
27  conspiracy to retaliate against Plaintiff for exercising his
    First Amendment Rights.  This objection is OVERRULED.
28

### H.  Plaintiff's Purported Termination by Larry Gonzales and Certain Other members of the PCDC Board.

Also on June 22, 1004, several members of the PCDC Board met with Plaintiff to address concerns about his job performance. CSUF #72.  Diana Westmoreland, another member of the PCDC Board who was present at the time,[8] recalls that Corser was instructed to work 6 hour days during normal business hours and urged to focus his energies toward financial issues, grant opportunities, and program management.  CSUF #73.  Corser denies that any such concerns or instructions were imparted to him on that day.  Corser Depo at 402-403.

On June 24th Corser failed to appear for work during normal business hours and failed to notify anyone in the office or any current Board member of his absence.  CSUF #74.  Alicia Rodriguez asserts that Corser's absence was therefore "unexcused."  CSUF #74.  Corser denies that his absence was unexcused on the ground that he was not notified of the requirement that he be present at the Community Center during regular business hours.  CSUF #74.

On the morning of June 24th, Corser attended a hearing concerning Jesus Colmenero, who, according to Corser, was then a member of the PCDC Board.  Colmenero also happened to be Corser's roommate.  CSUF #75; Corser Depo. at 196-97.  Defendants maintain that the hearing concerned criminal molestation charges against Mr. Colmenero and was therefore unrelated to PCDC business.  CSUF #75.  Corser maintains that the hearing _was_ relevant to PCDC business because it impacted whether or not a sitting board

---

[8]     It is not entirely clear from the record which other members of the PCDC Board were present at this meeting.

1  member would be able to return to his duties.  Corser Depo. at
2  345-46.  On that same afternoon, Corser, along with Katie Lopez,
3  was in Fresno where they had a meeting with the FBI.  CSUF #76.
4  Corser asserts that this was PCDC business also.  Corser Decl. at
5  ¶5.

6      According to Larry Gonzales, later that afternoon at the
7  Community Center, he informed Corser that he was being terminated
8  from his position with the PCDC.  CSUF #77.  Also present at the
9  time were Alicia Rodriguez, Maria Gonzales, and Ruth Stone.
10 Corser Depo. at 495.   Larry Gonzales also asserts that he asked
11 Corser to surrender his keys to the Community Center building,
12 but Corser refused.  CSUF #79.  Corser maintains that Gonzales
13 merely asked him to resign and never mentioned terminating him.
14 Corser Depo. at 404.  Corser did not believe he had been
15 terminated.  Id. at 494-96.

16

17      I.   Corser's Arrest.

18      Shortly before his purported termination, Corser changed the
19 alarm code to the Community Center building.  CSUF #80.  As a
20 result, those present in the PCDC office on the evening of the
21 24th were unable to set the building alarm.  CSUF #81.  That
22 evening, Maria Gonzales contacted the Merced County Sheriff's
23 office to advise them that an employee had been terminated and
24 had refused to return his key.  She requested observation of the
25 building.  CSUF #82.  She was afraid that Corser or someone else
26 might break into the building.  CSUF #83.

27      Maria Gonzales maintains that she did not give the police
28 Corser's name.  Doc. 100 at 6.  The Merced County Sheriffs

12

1    Department dispatch log suggests otherwise, stating that "David

2    was fired but refused to turn over his keys.  The [Reporting

3    Party] stated [David] has access to the safe and offices.

4    [Reporting Party] is having the locks changed tomorrow."  Pltf's

5    Ex. 1014.

6         Volunteer Deputy Sheriff Kevin Smallwood received a radio

7    call to watch out for an individual in and around the Planada

8    Community Center, who was not authorized to be there.  CSUF #88.

9    Smallwood went to the building and saw a person inside looking

10   out the window.  CSUF #90.[9]  Smallwood called Deputy Zyskowski to

11   let him know there was a person inside.  CSUF #91.

12        When Zyskowski arrived at the building, he had knowledge of

13   the report that an employee had been terminated and refused to

14   relinquish his keys.  Zyskowski suspected that Corser was

15   unlawfully within the building.  CSUF #93.

16        Corser taped the entire contact between himself, Deputy

17   Zyskowski, and Volunteer Smallwood at the Community Center.  CSUF

18   #94; *see also* County's Exhibit 60.  Corser claims that he

19   returned to the Community Center the night of the 24th to secure

20   the building as he would in the normal course of the day.  CSUF

21   #96.  His purpose in having the tape-recorder with him was "to

22   have evidence on tape if Gonzales was continuing to harass him."

23   CSUF #98.

24        Corser's recording depicts much of the interaction between

25   himself, Volunteer Smallwood, and Deputy Zyskowski that evening:

26

27        [9]    Corser asserts Smallwood would have been unable to see

28   him due to dark tinted windows.  Decl. at ¶10.

                                13

Corser:  The time is 9:15 and I came to turn the alarm off.  There was a Merced County, uh, patrol car outside shining the lights in.  I found the door to the office locked.

Uh, the alarm was off.  There was several -- there was a light on in the bathroom that I needed to turn off.  And I will set the alarm now.  (Footsteps)  I'm checking the backside door, see that the dead bolt is locked.  (Footsteps)  And I'm setting the alarm.  (Alarm beeps)  And leaving the building.

Uh, community volunteer car out -- outside the building and shining the light at me.

"Hi.  You work for Merced County?"

Smallwood:  "Yeah.  How you doing?"

Corser:  "Good.  What's your name?"

Smallwood:  "What's yours?"

Corser:  "David Corser."

Smallwood:  "Corser.  Okay.  Hold on."

Corser:  "Are you an officer?"

Smallwood:  "Yeah.  I have a deputy coming to talk to you for a minute."

Corser:  "Okay.  Could you identify yourself?"

Smallwood:  "What do you want?  Turn that off."

Corser:  "No.  I'm leaving this on."

Smallwood:  "I just need you to hang tight right here for a second.  Somebody wants to talk to you."

Corser:  "Actually, I'm -- I'm on my way home.  If you are going to detain me, then you need to tell me that."

Smallwood:  "Yes, I am then.  You are going to stay right here for a second."

Corser:  "What is your name?"

Smallwood:  "Are you suppose to be in here?"

Corser:  "What's your name, please?"

Smallwood:  "Are you suppose to be in here?  Are you suppose to be in here?"

14

1     Corser: "Kevin Smallwood?"

2     Smallwood: "Are you suppose to be in here?"

3     Corsr: "I'm an employee here. I was turning the alarm
system on."

4

5     Corser: "We are going to verify that. We're going to
verify that in just a second."

6     Smallwood: "Okay. Actually, I -- I need to get home.
But if you're detaining me, then you'll have to it --"

7

8     Smallwood: "Please stay right here."

9     Corser: "Actually, I don't think I do."

10    Smallwood: "Yes, you do."

11    Corser: "Officer--"

12    Smallwood: "I was told there was not suppose[d] to be
anybody in the building."

13    Corser: "Who were you told that by?"

14    Smallwood: "Just hang tight."

15    Corser: "Who told you that?"

16    Smallwood: "Hang tight."

17    Corser: Did you receive a phone call regarding someone
in the building?"

18

19    Smallwood: "Yes."

20    Corser: "From who?"

21    Smallwood: "Don't worry about it."

22    Corser: "You know what. I'm done. I'm leaving."

23    Smallwood: "Sir, stop."

24    Corser: "No. I'm leaving."

25    Smallwood: "You have keys? Let me see the keys to
the place."

26    Corser: "These keys belong to me."

27    Smallwood: "Do they belong in there?"

28    Corser: "Yes, they do."

1    Smallwood:  "Okay.  Just stand right here for a
     second."
2
     Corser:  "Could -- I'd like to request a California
3    Highway patrolman, please."

4    Smallwood:  "Just hang tight."

5    Corser:  "Officer Smallwood, I'd like to -- I'd like to
     request a California Highway patrolman."
6
     Smallwood:  "Just hang tight.  Just hang tight.  Stop.
7    Stop."

8    Corser:  "Excuse me.  I'd -- I'd like to request a
     California Highway patrolman, please.  I've already
9    said this to Officer Smallwood twice."

10   VOICE:  (Unintelligible)

11   Corser:  "No.  I'd like to request that.  It's a
     request.  I feel that I'm being unfairly treated by the
12   -- by the Merced Police Department and by the community
     volunteer sheriff.  I'd like to request immediately a
13   California Highway patrolman, please."

14   Zyskowski:  "Sure.  I can do that.  Do you have any ID
     on you, sir?"
15
     Corser:  "Not in -- no, I'm not presenting ID.  I'd
16   like you to -- to -- to -- to contact a California
     Highway patrolman, Officer Zyskowski."
17
     Zyskowski:  "That's Deputy Zyskowski."
18
     DISPATCHER:  9-1-3 (Unintelligible)
19
     Smallwood:  (Unintelligible)  "He came out of the door
20   and I saw that."

21   Corser:  "Yes, I did give him -- I gave you -- I told
     you I'm an employee here."
22
     Zyskowski:  (Unintelligible) ... "sir."
23
     Corser:  "Okay.  I'd like --" (Unintelligible) "Is
24   there a California Highway patrolman on the way?"

25   Zyskowski:  "Just hang tight."

26   Corser:  "You know what.  I'm leaving.  If you are
     going to detain me, you have to tell me."
27
     Zyskowski:  "Yes, we are."
28

                              16

1    Corser:  "Okay.  Are you putting me in cuffs?"

2    Zyskowski:  "Stop.  Stop."

3    Corser:  "Are you putting me in handcuffs?  I'm on my
     way home.  I'm requesting a California Highway
4    patrolman." "Okay.  I need to get to a telephone."

5    Zyskowski:  "Okay.  Hold on."

6    Corser:  "Are you detaining me?"

7    Zyskowski:  "Yes, I am."

8    Corser:  "Okay.  Then you need to read me my rights
     then."
9
     Zyskowski:  "Huh?"
10
     Corser:  "You need to read me my rights."
11
     Zyskowski:   "I have the right to detain you."
12
                        ***
13
     Zyskowski:  "Okay.  Have a seat.  Get up here on the
14   curb."

15   Corser:  "I'm requesting a California Highway
     patrolman."
16
     Zyskowski:  "Get up on the curb, please."
17
     Corser:  "Are you detaining me?  Huh?"
18
     Zyskowski:  "Yes."
19
     Corser:   "Are you detaining me?  For what cause?"
20
     Zyskowski:  "Because I don't know if you belong --"
21
     Corser:  "I already told Officer Smallwood that I'm an
22   employee here."

23   Zyskowski:  "Okay.  I want to see your ID so we can
     prove that."
24
     Corser:  "Who -- uh, uh, what caused your response to
25   this building at this moment?"

26   Zyskowski:  "Excuse me?"

27   Corser:  "What caused you to respond to this building?"

28   Zyskowski:  "You need to just have a seat right now.

                        17

1      Okay?  Have a seat."

2      Corser:  "Whoa.  You got -- you are way beyond your
       rights, way beyond your rights."
3
       Zyskowski:  "Way beyond our rights?"
4
       Corser:  "Yeah."
5
       Zyskowski:  "Well, sir, I have done nothing but treat
6      you with respect and everything else.  I'm requesting
       you to sit down there."
7
       Corser:  "Okay.  And I'm telling you I'm an employee."
8
       Zyskowski:  "I'm a police officer with the state --
9      within the state of California."

10     Corser:  "Okay."

11     Zyskowski:  "I'm with the sheriff's department.  I'm
       requesting you to have a seat.  Are you obstructing my
12     duties?"

13     Corser:  "I'm requesting -- I've requested a California
       Highway patrolman."
14
       Zyskowski:  "Are you obstructing my duties?  I'm
15     requesting you to have a seat here, sir.  Can you have
       a seat?"
16
       Corser:  "No.  If you need to cuff me, then cuff me and
17     take me away."

18     Zyskowski:  "Cuff you and take you away?"

19     Corser:  "If that's what you need to do.  I've
       requested --"
20
       Zyskowski:  "Okay.  Do you have your ID on you, sir?"
21
       Corser:  "I -- I -- no, I don't."
22
       Zyskowski:  "Could I ask you your name?"
23
       Corser:  "Sure.  David Corser."
24
       Zyskowski:  "David what?"
25
       Corser:  "David Corser.  C-O-R-S-E-R."
26
       Zyskowski:  "Okay.  David, were you just recently
27     terminated from this place?"

28     Corser:  "Absolutely not."

                              18

1    Zyskowski:    "You were not terminated from this place?"

2    Corser:  "Absolutely not."

3    Zyskowski:  "Okay.  You need to have a seat for me,
     David.  Okay?  Have a seat."
4
     Corser:  "I've requested a California Highway
5    patrolman."

6    Zyskowski:  "This is the Merced County Sheriff's
     Department jurisdiction.  I've explained to you nicely
7    the first time.  You are to have a seat.  Okay?  Can
     you have a seat?"
8
     Corser:  "Uh.  No.  If you need to take me, take me
9    in."

10   Zyskowski:  "Okay.  I have no choice."

11   Corser:  "Okay."

12   Zyskowski:  "Sir."

13   Corser:  "No.  No.  This is my property."

14   Zyskowski:  "Sir, don't.  Don't."

15   Corser:  "This is my property."

16   Zyskowski:  "Don't.  Do not hit me with that.  Stop.
     Stop."
17
     Corser:  "Help.  Help.  Help.  Help.  Help."
18
     Zyskowski:  "All right.  Don't hit me with that tape
19   recorder."

20   Corser:  "Help.  California highway Patrol.  Call them
     immediately.  California Highway Patrol.  California
21   Highway Patrol.  California Highway Patrol."

22   Zyskowski:  "Step it up."

23   Corser:  "CHP.  CHP.  9-1-1.  9-1-1.  9-1-1.  9-1-1.
     9-1-1.  9-1-1."
24
     Zyskowski:  "Give it up."
25
     Corser:  "California Highway Patrol.  9-1-1. California
26   Highway Patrol.  9-1-1.  California Highway Patrol."

27   Zyskowski Depo. at 144-150.

28       According to Zyskowski, at some point toward the end of this

                            19

1    interaction, Zyskowski attempted to handcuff Corser, at which

2    time Corser began to move his shoulders rapidly.  Zyskowski

3    believed this was an attempt to escape.  CSUF #104.  During these

4    shoulder movements, Zyskowski was hit in the groin with Corser's

5    tape-recorder, causing Zyskowski pain.  Both men ended up falling

6    on top of Volunteer Smallwood.  CSUF #105.  After he was

7    handcuffed, Corser was placed into Zyskowski's patrol unit.

8    Zyskowski recalls that Corser would not put his legs inside the

9    unit voluntarily.  CSUF #107.  During the altercation, Zyskowski

10   got a scrape on his arm that did not require medical attention.

11   CSUF #109.

12        Corser denies that he made any rapid shoulder movements or

13   other movements, denies that he delayed or obstructed the

14   investigation, and denies that he attempted to escape in any way

15   while being handcuffed.  Corser Decl. at ¶19.  He also denies

16   hitting Office Zyskowski with his tape recorder in the groin.

17   *Id*.

18        Corser claims he sustained a "bloody knee and bloody

19   shoulder" during the arrest and that a nurse at the jail bandaged

20   him up.  Corser Depo. at 286.

21        Later that evening, the Sheriff's Office called Maria

22   Gonzales, informed her Corser had been arrested, and asked her

23   to come down to the Community Center to identify him.  CSUF #111.

24   Maria Gonzales reports that she and Rodriguez went to the

25   Community Center at the request of the police.  CSUF #112.

26

27

28

1

**IV.  STANDARD OF DECISION**

2      Summary judgment is warranted only "if the pleadings,

3 depositions, answers to interrogatories, and admissions on file,

4 together with the affidavits, if any, show that there is no

5 genuine issue as to any material fact."  Fed. R. Civ. Pro. 56(c);

6 *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

7 Therefore, to defeat a motion for summary judgment, the non-

8 moving party must show (1) that a genuine factual issue exists

9 and (2) that this factual issue is material.  *Id*.  A genuine

10 issue of fact exists when the non-moving party produces evidence

11 on which a reasonable trier of fact could find in its favor

12 viewing the record as a whole in light of the evidentiary burden

13 the law places on that party.   *See Triton Energy Corp. v. Square

14 D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.

15 Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  The evidence

16 must be viewed in a light most favorable to the nonmoving party.

17 *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products,

18 Inc.*, 268 F.3d 639, 644 (9th Cir. 2001), *amended by* 2001 WL

19 1490998 (9th Cir. 2001).  Facts are "material" if they "might

20 affect the outcome of the suit under the governing law."

21 *Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S.

22 at 248).

23      The moving party bears the initial burden of demonstrating

24 the absence of a genuine issue of fact.  *Devereaux v. Abbey*, 263

25 F.3d 1070, 1076 (9th Cir. 2001).  If the moving party fails to

26 meet this burden, "the nonmoving party has no obligation to

27 produce anything, even if the nonmoving party would have the

28 ultimate burden of persuasion at trial."  *Nissan Fire & Marine*

*Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp.*, 68 F.3d at 1221. The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux*, 263 F.3d at 1076.

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23.

"In order to show that a genuine issue of material fact exists, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'" *Rivera v. AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249). If the moving party can meet his burden of production, the non-moving party "must produce evidence in response....[H]e cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or

1    conclusory statements." *Hernandez v. Spacelabs Med., Inc.*, 343

2    F.3d 1107, 1112 (9th Cir. 2003).  "Conclusory allegations

3    unsupported by factual data cannot defeat summary judgment."

4    *Rivera*, 331 F.3d at 1078.

5

6                        II.  **ANALYSIS**

7         A.   Threshold Issue: Timeliness of Plaintiff's Opposition.

8         Plaintiff's oppositions to the pending motions for summary

9    judgment were due on December 29, 2008.  Although Plaintiff did

10   file some documents in connection with his opposition before the

11   deadline, some were filed in early hours of the morning of

12   December 30, 2008, while others were filed on December 31, 2008.

13   *See* Docs. 136-154.

14        At oral argument, Plaintiffs' counsel represented that his

15   failure to meet the filing deadlines was inadvertent.  He

16   apparently tried to file documents as fast as he could on the

17   evening of the deadline, but had some difficulty uploading

18   exhibits electronically.  This resulted in some of his filings

19   being dated early in the morning of December 30, 2008.

20   Plaintiff's counsel similarly claimed to have inadvertently

21   forgotten to file certain other documents until December 31,

22   2008.

23        Although counsel's excuses are not particularly compelling,

24   the delay was short and it does not appear that any prejudice

25   resulted.  A district court has discretion to consider late

26   filings.  *Jenkins v. Commonwealth Land Title Ins. Co.*, 95 F.3d

27   791, 795 (9th Cir. 1996); *see also Roush v. Lemke*, 2007 WL

28   1309538, *1 (W.D. Wash. May 2, 2007); *Bean v. Shapiro*, 2006 WL

                              23

3411875, *2 (N.D. Cal. Nov. 27, 2006).  The late-filed opposition documents will be considered, but Plaintiff's counsel is warned that no further late filings will be permitted.

### B.   Larry Gonzales' Motion for Summary Judgment.

Defendant Larry Gonzales argues: (1) that he is entitled to summary judgment on the section 1983 First Amendment retaliation claim because there is no evidence that (a) he was a state actor or (b) that he interfered with Plaintiffs' assertion of First Amendment Rights; (2) he cannot be held individually liable for the actions of the PCDC Board; (3) he is entitled to summary judgment as to the California Civil Code Section 52.1 claim because there is no evidence that he intimidated or coerced Plaintiff in a manner that interfered with Plaintiff's civil rights; and (4) there is no competent evidence to support Plaintiff's allegations of a conspiracy in violation of section 1983.

### 1.   State Action Requirement.

In a January 10, 2006 decision, Doc. 35, the district court rejected Larry Gonzales' argument, made in the context of a motion to dismiss, that he was not a state actor for purposes of liability under section 1983:

> Defendant Gonzales characterizes the Planada CDC as a "private, non-profit corporation that develops projects to benefit Planada."  Mot. to Dismiss at 4.  He argues that the only conduct of his about which the Plaintiff has complained is allegedly violating Plaintiff's federal and state civil rights by terminating Plaintiff's employment from the Planada CDC.  Mot. to Dismiss at 6.  This conduct stems from Defendant Gonzales' activity for a private corporation, and no

state action is present, which bars a Section 1983
claim against Gonzales.

Plaintiff first objects to the narrow way in which
Defendant Gonzales characterizes the allegations
against him.   Plaintiff reiterates that Defendant
Gonzales participated in a broad-based campaign of
harassment, of which Plaintiff's eventual dismissal was
only a part.   Plaintiff notes Gonzales' concession that
the Planada CDC is a "quasi-governmental entity."   Mot.
in Opp. at 2; *see* Mot. to Dismiss at 13 (arguing that
the Planada CDC's meetings and activities fall under
the purview of California Code of Civil Procedure
Section 425.15, the "Anti-SLAPP" statute).   Although
generally inapplicable to private parties, a Section
1983 claim can lie against a private party when he is a
willful participant in joint action with the State or
its agents.   *Peng v. Mei Chin Penghu*, 335 F.3d 970, 980
(9th Cir. 2003).   In *Brunette v. Humane Society of
Ventura County*, an opinion cited by neither side, the
Ninth Circuit stated that proof of a conspiracy between
the state and a private party to deprive another of his
constitutional rights can satisfy the joint-action test
for Section 1983 liability.   *Brunette*, 294 F.3d 1205,
1211 (9th Cir. 2002).

The complaint, the factual averments of which the court
accepts as true for the purposes of deciding a motion
to dismiss, *see ASW v. Oregon*, 424 F.3d 970, 974 (9th
Cir. 2005), alleges in substance that Defendant
Gonzales conspired with the other Defendants,
themselves allegedly state actors, and acted in concert
with them to deprive Plaintiff of his constitutional
rights.   The Second Cause of Action particularizes this
claim to the deprivation of First Amendment free-speech
and petition rights.   These allegations are sufficient
to satisfy the color-of-state-law requirement.

Doc. 35 at 6-7 (emphasis added).

Defendant Larry Gonzales now argues on summary judgment

that there is no _evidence_ to support the allegation that he is a

"state actor" for purposes of section 1983.   A private actor may

be deemed to have engaged in state action for purposes of section

1983 under certain circumstances.   *See Villegas v. Gilroy Garlic

Festival Ass'n*, 541 F.3d 950, 954-55 (9th Cir. 2008).

Under familiar principles, even a private entity can,
in certain circumstances, be subject to liability under
section 1983. *See Sutton v. Providence St. Joseph*

25

*Medical Ctr.*, 192 F.3d 826, 835-36 (9th Cir.1999). In *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), the Supreme Court created a two step analysis for determining* whether or not there was state action by a private actor sufficient to establish liability for a constitutional tort. The first inquiry was "whether the claimed deprivation has resulted from the exercise of a right or privilege having its source in state authority." Id. at 939.  The second was "whether, under the facts of this case, ... [the] private parties, may be appropriately characterized as 'state actors.' " *Id*. In *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001), the Court introduced a multi-factored test. Id. at 295-300. The inquiry is a general one: "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " *Id*. at 295 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). Some of the factors to consider in determining whether there is a "close nexus" are: (1) the organization is mostly comprised of state institutions; (2) state officials dominate decision making of the organization; (3) the organization's funds are largely generated by the state institutions; and (4) the organization is acting in lieu of a traditional state actor. *See id*. at 295-99, 121 S.Ct. 924.

*Id*. (parallel citations omitted).

Plaintiff first asserts that, under state law, the Planada CDC, of which Larry Gonzales is a member, is in effect a "quasi-governmental entity," possessing powers, duties, and responsibilities similar to a municipal government.[10]  Larry Gonzales actually concedes this as "undisputed."  Doc. 159-2 at

---

[10]     Corser cites *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 473-79 (2000), in which a California appellate court fond that a homeowner's association board operated as a quasi-governmental entity for the purposes of determining whether allegedly defamatory speech before the homeowners association constituted speech before a "public forum" under California's anti-SLAPP statute, Cal. Code Civ. Pro. § 425.16.  *Damon* is not relevant to the key issue here: whether Gonzales, by virtue of his membership in the Planada CDC, should be deemed a state actor for purposes of section 1983.

1  #21.  But this concession is not sufficient on its own to satisfy

2  the state action requirement.  It is not enough that the entity

3  be quasi-governmental under state law.  Under section 1983, a

4  private actor may be deemed a state actor if it performs

5  functions traditionally and <u>exclusively</u> reserved to the States,

6  such as when the private actor holds elections, or governs <u>all</u>

7  attributes of a town.  *See Flagg Bros., Inc. v. Brooks*, 436 U.S.

8  149, 159-160 (1978).  Plaintiff has offered no evidence or

9  argument explaining why the activities of the Planada CDC, a

10  nonprofit corporation, satisfy this test.

11      The complaint survived Larry Gonzales' motion to dismiss

12  because Plaintiff "allege[d] in substance that Defendant Gonzales

13  conspired with the other Defendants, themselves allegedly state

14  actors, and acted in concert with them to deprive Plaintiff of

15  his constitutional rights."  Doc. 35 at 7.  In response to a

16  motion for summary judgment, Plaintiff must point to specific

17  facts that support his allegations.  Here, although Plaintiffs'

18  opposition filings do not point to where in the record relevant

19  evidence might be located,[11] an independent review of Plaintiff's

20

21      [11]   The only other argument concerning the state action
    requirement contained in Plaintiff's opposition is:

22

23          There is a triable issue of fact as to whether
            Defendant Larry Gonzales caused the wrongful arrest of

24          Plaintiff which would constitute a violation of his
            civil rights.  Defendant Larry Gonzales knew he did not

25          have authority to fire Plaintiff and lied to police to
            have him arrested.  The actions of Defendant Larry

26          Gonzales on June 24 2004, constitute state action.

27  Doc. 154 at 2.  But, this does not explain <u>why</u> Larry Gonzales is

28  a state actor.

citations to the record reveals some arguably relevant evidence.

The evidence, viewed in a light most favorable to Plaintiff, suggests that Bryant Owens and Kathy Lopez were removed from the PCDC Board, at least in part, because they refused to "work with" the County.  Larry Gonzales stated, in interrogatories filed in a state case brought by Bryant Owens, that during the relevant time period, Keene identified a $50,000 grant for PCDC, but would only help the PCDC go after the grant if there "was someone representing the corporation with whom she felt she could work." Pltf's Ex. 1002 at Response #8.  Gonzales indicated that Keene felt she could not work with Lopez or Owens.  *Id*.  Mr. Gonzales also testified at his deposition that someone named "Mike" who worked for the County said that the County would give PDCD some time to acquire a new place to operate, but only if PCDC "worked with them."  L. Gonzales Depo. at 146.  Gonzales interpreted this to mean that the County wanted to work with people who would not "bully people around ... talk about supervisors" or file "lawsuits against the sheriff's association."  *Id*.  In other words, the County wanted to "work as human beings" and Gonzales believed that Katie Lopez and Bryant Owens were not acting like human beings.  *Id*.  The implication of this testimony, if given weight by a trier of fact, is that someone at the County indicated to Gonzales that if he did not get rid of Owens and Lopez, the County would not help the PCDC.  Gonzales testified that, although he did not initially group Plaintiff with Owens and Lopez, he came to view him in a similar, negative light.  *Id*.

Plaintiff cites to absolutely no evidence, however, that any County actor made any statements to Gonzales regarding <u>Plaintiff</u>,

implied that the County wanted <u>Plaintiff</u> fired, or suggested that County assistance would be easier to obtain if <u>Plaintiff</u> was removed from his position.  There is simply no evidence of a conspiracy between any County employee or officer concerning Plaintiff.

Plaintiff also asserts that Defendant Ruth Stone told Plaintiff that she was extremely bothered by Bryant Owens and that anyone associated with Bryant Owens was "going down."  CSUF #60; Corser Depo. at 94.  Stone specifically denies having said such things to Corser.  CSUF #61.  Even viewing the facts in a light most favorable to Plaintiff, this in no way satisfies the state action requirement <u>as to Larry Gonzales</u>.  First, Stone's status as the chairperson of the MAC, an advisory board constituted by the County, does not transform her every act and/or statement into "state action."  Plaintiff stated in his deposition testimony that Stone made these comments while discussing her belief that the "Planada Association[12] was the worst thing that ever happened to [Planada]."  Corser Depo at 94-95.  Plaintiff does not draw any connection between these comments and Stone's role in the MAC.  *Id*.  Even if Stone made these comments while presiding over a MAC meeting, Plaintiff has not identified any evidence demonstrating that the MAC is a state actor.  There is no evidence that the MAC had any authority over County decision-making, or that it satisfies the state action requirement in any other way.  The mere fact that MAC members may be appointed by the County is insufficient on its own.  *See Darr*

---

[12]   The Planada Association was one of the organizations that filed suit against the County.

*v. Town of Telluride, Colorado*, 495 F.3d 1243, 1256-57 (10th Cir. 2007) (suggesting without deciding that actions of citizens advisory board made up of town-appointed community volunteers without any legislative or public policy decision-making authority would not constitute state action).

Defendant Larry Gonzales' motion for summary judgment as to the Second Cause of Action for First Amendment Retaliation in violation of Section 1983 is GRANTED.  This conclusion applies with equal force to Plaintiffs' seventh cause of action for conspiracy in violation of section 1983.[13]  It is not necessary to address Gonzales' alternative arguments regarding the section 1983 claims.

## 2.   Individual Liability of Larry Gonzales.

Larry Gonzales next argues that he cannot be held individually liable for the actions of the PCDC Board, citing California Corporations Code § 7350(a), which provides that no member of a nonprofit corporation can be "personally liable for the debts, liabilities, or obligations of the [nonprofit] corporation."  He also cites *Zumbrun v. University of Southern*

---

[13]    Plaintiff also attempts to advance 42 U.S.C. § 1985 as an alternative basis for his claims, because it is mentioned in the body of his complaint.  *See* Compl. at ¶43.  Section 1985 only applies when a plaintiff alleges membership in a protected class. *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (explaining that section 1985 has only been extended to non-racial groups if the courts have designated the class in question "a suspect or quasi-suspect classification requiring more exacting scrutiny or ... Congress has indicated through legislation that the class requires special protection.").  There is no such allegation or evidence in this case.

*California*, 25 Cal. App. 3d 1, 10 (1972), which applied the predecessor to § 7350(a) to a breach of contract case between a university and a student, and *Gantman v. United Pacific Ins., Co.*, 232 Cal. App. 3d 1560 (1991), which applies § 7350 to bar members of a nonprofit association from bringing suit against the association's insurer.  These authorities do support the conclusion that Mr. Gonzales cannot be held liable under state law for actions taken by the board as a whole.  However, Corporations Code 7350(a) does not bar Plaintiff's claims that Mr. Gonzales took actions as an <u>individual</u> which violated state law.  In this case, it is disputed whether Mr. Gonzales undertook the allegedly unlawful conduct on his own, or as one member of a voting Board.  This conclusion is largely academic, however, because Mr. Gonzales is entitled to summary judgment as to all of the claims against him on other grounds.

### 3.  Liability under California Civil Code Section 52.1.

California Civil Code section 52.1(b) provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California.]"  This provision is part of the Tom Bane Civil Rights Act, the primary purpose of which is to address hate crimes perpetrated against minorities.  *Stamps v. Superior Court*, 136 Cal. App. 4th 1441, 1447-48 (2006).  Section

52.1 requires "[1] an attempted or completed act of interference with a legal right, accompanied by [2] a form of coercion." *Jones v. Kmart Corp.*, 17 Cal. 4th 329 (1998).  As a matter of law, no claim exists under the Bane Act for alleged constitutional violations that, by their nature, can only be perpetrated by a state actor against a minority.  For example, in *Jones*, Kmart employees were aggressive in their detention of Jones for alleged shoplifting.  Nevertheless, the plaintiff in *Jones* could not state a claim under Section 52.1 based on the prohibition against unreasonable search and seizure because Section 52.1 does not apply to private actors' purported violations of legal guarantees that only limit government power, such as the Fourth Amendment.  *Id.* at 334.

Corser does not address the section 52.1 claim in his opposition.  Here, Corser's only bases for a section 52.1 claim against Larry Gonzales are related to First and Fourth Amendment protections, which are limitations upon government power, not private citizens.  Larry Gonzales' motion for summary judgment as to the section 52.1 claim is GRANTED.

C.   Maria Gonzales' Motion for Summary Judgment.

Defendant Maria Gonzales argues: (1) the 1983 claim for first amendment retaliation "lacks merit" on a variety of grounds; (2) the 1983 claim for unlawful arrest and detention lacks merit because (a) the report she made to police was in good faith, and (b) she was not present at the CDC office when Plaintiff was arrested; (3) Plaintiff's state law claim for false arrest (a) lack merit for the same reasons his federal claim

lacks merit, and (b) are barred by the statute of limitations; (4) Plaintiff's California Civil Code § 52.1 claim fails for the same reasons his federal claims fail; and (5) there is no evidence to support Plaintiff's conspiracy claims against Ms. Gonzales.  Doc. 100.

### 1.   State Action Requirement.

As was the case with Larry Gonzales, Maria Gonzales is a private actor.  To state a claim against her under section 1983, Plaintiff must demonstrate a sufficient connection between her conduct and state action.  The only evidence Plaintiff presents is his own deposition testimony that Maria Gonzales told him that Bryant Owens and Katie Lopez had been "taken care of" and that Plaintiff would be "next to go."  Corser Depo. at 464. Presumably, Plaintiff presents this in an effort to demonstrate Maria Gonzales' participation in a conspiracy to violate his rights.  Although, viewed in a light most favorable to Plaintiff, this statement demonstrates hostility toward Plaintiff, it fails to demonstrate Maria Gonzales' connection to any conspiracy involving state actors to violate Plaintiff's constitutional rights.  Accordingly, no section 1983 claim can stand against Ms. Gonzales.  Her motion for summary judgment as to the First, Second and Seventh causes of action is GRANTED.

### 2.   Plaintiff's State Law Claims for False Arrest.

Ms. Gonzales argues that Plaintiff's state law claim against her for false arrest lacks merit because:  (a) she cannot be held liable for false arrest and/or false imprisonment because the

report she made to police was in good faith; (b) she was not present at the scene of the arrest; and (c) the statute of limitations expired before Plaintiff filed his complaint in this case.

    a. <u>Good Faith Belief in Truth of Police Report.</u>

  Ms. Gonzales argues that she cannot be liable for false arrest and/or imprisonment because she had good faith belief in the truth of the information she gave to the police, citing *Peterson v. Robinson*, 43 Cal. 2d 690, 695 (1954), *Wilson v. Los Angeles County*, 21 Cal. App. 3d 308, 316-17 (1971), and *Turner v. Mellon*, 41 Cal. 2d 45, 58 (1953).  These cases once stood generally for the proposition that a defendant who took no active part in an arrest could not, in the absence of malice, be held liable for reporting suspected criminal activity to police in good faith.  Were this line of authority still valid, it would not help Ms. Gonzales, because there is evidence of her malice toward Plaintiff in this case.

  However, this entire line of authority has been disapproved by *Hagberg v. California Federal Bank FSB*, 32 Cal. 4th 350 (2004), in which the California Supreme Court addressed whether California's litigation privilege, set forth in California Civil Code § 47, protected reports made to police with malice (i.e., in bad faith).  *Hagberg* departed from earlier precedent, holding that even a deliberately false police report is absolutely privileged when the reporting party contacts law enforcement to report suspected criminal activity and instigate a response from law enforcement.  *Id*. at 361-62.  Ms. Gonzales does not raise

California Civil Code § 47, so it is not appropriate to apply it to the pending motion.  This oversight is not material to the outcome of this claim, however, as Ms. Gonzales is entitled to summary judgment on other grounds.

### b.   Ms. Gonzales' Presence at the Scene of the Arrest.

Ms. Gonzales next argues that the section 1983 claim against her for unlawful arrest and imprisonment is meritless because she was not present at the time he entered the PCDC offices on the evening of his arrest, nor was she present when he was arrested. Ms. Gonzales supports this argument, not with any authority, but by disputing several assertions Plaintiff made in his responses to her Special Interrogatories.  But, even if Ms. Gonzales' version of the events is true, she does not explain how this renders the claim against her meritless.  Plaintiffs' central allegation is that she and others took actions that caused his unlawful arrest, not that they actually effected the arrest.  Her motion for summary judgment on the false arrest/imprisonment claim cannot be granted on this ground.

### c.   Statute of Limitations.

The statute of limitations for state law claims of false arrest and false imprisonment is one year from the date of accrual.  Cal. Code Civ. Pro § 340(3).  Plaintiff was arrested on June 24, 2004 and released from custody on June 25, 2004, but did not file his complaint in this matter until July 29, 2005, more than one year after his release from prison.  Plaintiff did not

address Ms. Gonzales' statute of limitations argument in his opposition.

Cal. Gov. Code § 945.3 provides for the tolling of the statute of limitations for any claim against a police officer or public entity employing a police officer while charges against plaintiff are pending in superior court.[14]  However, section 945.3 does not apply to claims against private defendants, such as Ms. Gonzales.  Plaintiff presents no basis for tolling the statute of limitations in this case, and none is apparent from the record.  Ms. Gonzales' motion for summary adjudication on the statute of limitations ground is GRANTED.

### 3.   California Civil Code § 52.1 Claim.

As is the case with Mr. Gonzales, Ms. Gonzales is entitled to summary judgment on the California Civil Code § 52.1 claim, because Plaintiff's allegations are based entirely on the First and Fourth Amendments, which proscribe conduct by state actors, not private individuals.  *See Jones*, 17 Cal. 4th at 334.

### D.   County of Merced, *et al.'s*, Motion for Summary Judgment.

The County of Merced moves for summary judgment on all claims against it, its officers, and its employees.

---

[14]    The County does not raise the statute of limitations as a defense to this claim.  No party has pointed to evidence concerning whether any charges were ever filed and/or when any such charges were resolved.

1

2

     **1.**  **Section 1983 Claim for Illegal Warrantles Arrest Against the County, Smallwood, and Zyskowski.[15]**

3

     **a.**  **Deputy Zyskowski.**

4

    Plaintiff alleges that Defendant Zyskowski is liable under

5

section 1983 for violating his Fourth Amendment right to be free

6

from unlawful arrest without a warrant or probable cause.

7

Zyskowski argues the arrest was supported by probable cause and

8

asserts the defense of qualified immunity.

9

    The Supreme Court recently summarized the purpose of

qualified immunity:

10

11

> The doctrine of qualified immunity protects government
> officials "from liability for civil damages insofar as
> their conduct does not violate clearly established
> statutory or constitutional rights of which a
> reasonable person would have known." *Harlow v.*
> *Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified
> immunity balances two important interests-the need to
> hold public officials accountable when they exercise
> power irresponsibly and the need to shield officials
> from harassment, distraction, and liability when they
> perform their duties reasonably. The protection of
> qualified immunity applies regardless of whether the
> government official's error is "a mistake of law, a
> mistake of fact, or a mistake based on mixed questions
> of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567
> (2004) (Kennedy, J., dissenting) (citing *Butz v.*
> *Economou,* 438 U.S. 478, 507 (1978) (noting that
> qualified immunity covers "mere mistakes in judgment,
> whether the mistake is one of fact or one of law")).

12

13

14

15

16

17

18

19

20

> Because qualified immunity is "an immunity from suit
> rather than a mere defense to liability … it is
> effectively lost if a case is erroneously permitted to
> go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526
> (1985) (emphasis deleted). Indeed, we have made clear
> that the "driving force" behind creation of the
> qualified immunity doctrine was a desire to ensure that
> " 'insubstantial claims' against government officials
> [will] be resolved prior to discovery." *Anderson v.*
> *Creighton,* 483 U.S. 635, 640, n.2 (1987). Accordingly,

21

22

23

24

25

26

           [15]  The First Cause of action also names Does 1 through 15,
but Plaintiff has pointed to no evidence implicating any
additional persons.

27

28

"we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam).

*Pearson v. Callahan*, --- S. Ct. ---, 2009 WL 128768 (Jan. 21. 2009)

Deciding qualified immunity normally entails a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). A court must ask whether, taken in the light most favorable to the plaintiff, the facts alleged show the officers' conduct violated a constitutional right. *Id*. In addition, a court must also inquire whether the right violated was "clearly established" by asking whether a reasonable officer could believe that the defendant's actions were lawful. *Id.* District courts have discretion to determine the order in which these inquiries take place. *Pearson*, --- S. Ct. ---, 2009 WL 128768.

The traditional summary judgment approach should be used in analyzing the first step of the *Saucier* analysis:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right? Where the facts are disputed, their resolution and determinations of credibility are manifestly the province of a jury.

*Wall v. County of Orange*, 364 F.3d 1107, 1110-11 (9th Cir. 2004) (internal citations and quotations omitted). In the second step, the court must ask whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted. Although this inquiry is primarily a legal one, where the reasonableness of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact

38

**1**
**2**
**3**
... summary judgment is not appropriate." *Wilkins v. City of Oakland*, 364 F.3d 949, 1110-11 (9th. Cir. 2003) (citing *Saucier*, 533 U.S. at 216 (Ginsburg J., concurring)).

**4**
**5**
**6**
**7**
**8**
The key question here is whether the facts, taken in the light most favorable to Corser, show that Zyskowski violated Corser's right to be free from arrest without probable cause. Probable cause is determined under the particular factual context of each case. *Illinois v. Gates*, 462 U.S. 213, 232 (1983).[16]

**9**
**10**
**11**
**12**
**13**
**14**
**15**
**16**
**17**
**18**
**19**
**20**
**21**
**22**
Here, it is appropriate to find that the Deputies believed in good faith the report that a disgruntled, recently terminated ex-employee of the PCDC had refused to return the keys to the Community Center and might be attempting to enter the premises without permission.  Specifically, the Merced County Sheriff's dispatch log states that:  "David was fired but refused to turn over his keys.  The [Reporting Party] stated [David] has access to the safe and offices.  [Reporting Party] is having the locks changed tomorrow."  Pltf's Ex. 1014.  Plaintiff offers no evidence to suggest that the Deputies' had any reason to believe the report was false.  Rather, Zyskowski had reason to believe a man named David had been fired from his employment at the Community Center, that he had refused to return his keys, and that he had access to the safe.

**23**
**24**
In the course of attempting to determine whether Corser had committed a crime, the recording reveals Zyskowski requested that

**26**
**27**
**28**
[16]   The County also cites a number of cases concerning detentions that stop short of arrest.  But, because Plaintiff's claim is limited to unlawful arrest, it is not necessary to address pre-arrest detention here.

1  Corser remain in the area and stay seated.  Corser repeatedly

2  refused to comply.  California Penal Code § 148 criminalizes

3  resisting or obstructing a peace officer in performance of his or

4  her duties.  *See People v. Allen*, 109 Cal. App. 3d 981 (1980)

5  (broadly interpreting Penal Code § 148 to apply where police

6  observed defendant viewing articles of clothing in the trunk of a

7  car and then close trunk and flee when he observed police

8  approaching).

9       To survive summary judgment, Plaintiff must set forth

10  specific facts that contradict Deputy Zyskowski's version of

11  events.  *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d

12  912, 922 (9th Cir. 2001) (affirming summary judgment in favor of

13  defendants on claim of unreasonable force despite plaintiff's

14  conclusory statement that she "did not resist arrest in any way"

15  because plaintiff failed to refute officer's report that she

16  stiffened her arm and attempted to pull it away, which was

17  "impermissible" regardless of whether officer had probable cause

18  to arrest her).  Plaintiff has not done so, rather he only states

19  in his declaration:

20              On June 24, 2004, at the time of my arrest by Officer
             Zyskowski, I did not delay, obstruct or resist the
21              arrest of myself with rapid shoulder movements or any
             other movements. I did not delay or obstruct his
22              investigation. In no way shape or form did I attempt to
             escape while being handcuffed. I did not hit Officer
23              Zyskowski with my tape recorder in the groin during my
             arrest.

24  Doc. 139 at ¶19.  The conclusory assertion that he "did not delay

25  or obstruct" Zyskowski's investigation does not contradict the

26  contents of the recording Plaintiff made of his encounter with

27  Deputy Zyskowski.  The undisputed evidence shows Corser

28

                                    40

repeatedly refused to comply with a law enforcement officer's directions and continued to yell in an hysterical and obstructive manner that challenged the Deputy's authority to perform his investigatory duties.  This leads to the inescapable conclusion that Zyskowski had probable cause to arrest Corer for violating California Penal Code § 148.[17]

Zyskowski's motion for summary judgment on the unlawful arrest claim is GRANTED.[18]

### b.   Volunteer Smallwood.

The undisputed evidence reveals that Smallwood did not place Plaintiff under arrest.  He merely reported to Deputy Zyskowski that Corser was on the premises of the Community Center, told Corser to wait until Zyskowski arrived, and then stood by while Zyskowski made contact with Corser.  Deputy Zyskowski had probable cause to place Corser under arrest fory delaying, resisting, and obstructing a peace officer, based solely on Corser's conduct while Zyskowski was present.  Smallwood did nothing inappropriate and is entitled to summary judgment on this claim.

[17]     This conclusion is not affected by the fact that Corser was actually booked on more serious charge of "resist[ing], delay[ing], or obstruct[ing] any ... peace officer ... in the discharge or attempt to discharge any duty of his or her office or employment..." under California Penal Code § 69.  *See* County's Exhibit R, Doc. 133.

[18]     Corser separately asserts that Zyskowski arrested him in retaliation for complaining about his conduct at the MAC meeting.  This allegation, addressed in the context of Corser's first amendment retaliation claim, has no bearing on the question of whether probable cause existed.

1

### c.    The County.

2

       Plaintiff also names the County as a defendant in his

3

unlawful arrest claim.   Under the Supreme Court's decision in

4

*Monell v. Dep't of Soc. Svcs. of City of New York*, 436 U.S. 658,

5

694 (1978), a local government is liable under § 1983 if its

6

policies cause constitutional torts.   *See also McMillian v.*

7

*Monroe County*, 520 U.S. 781, 785 (1997).   A litigant can

8

establish a *Monell* claim in one of three ways:   "(1) by showing a

9

longstanding practice or custom which constitutes the standard

10

procedure of the local governmental entity; (2) by showing that

11

the decision-making official was, as a matter of state law, a

12

final policymaking authority whose edicts or acts may fairly be

13

said to represent official policy in the area of decision; or (3)

14

by showing that an official with final policymaking authority

15

either delegated that authority to, or ratified the decision of,

16

a subordinate."   *Menotti v. City of Seattle*, 409 F.3d 1113, 1147

17

(9th Cir. 2005) (internal quotations omitted).   Plaintiff has

18

pointed to absolutely no evidence to support a *Monell* claim here.

19

He refers to no prior practices or customs, and identifies no

20

policy-maker or command-level decision or ratification.   The

21

County's motion for summary judgment is GRANTED.

22

23

### 2.    Section 1983 Claim for Excessive Force Against the County, Smallwood, and Zyskowski.

24

       Although the caption of Plaintiffs' Second Cause of Action

25

mentions only "Illegal Warrantless Arrest," the body of the

26

complaint clearly raises excessive force as a component of this

27

28

42

1    section 1983 claim.   Compl. at ¶44.[19]

2

3                   a.    Volunteer Smallwood.

4         There is evidence that Corser and Deputy Zyskowski fell on

5    top of Volunteer Smallwood while Zyskowski was attempting to

6    place Corser in handcuffs, but there is no evidence suggesting

7    Smallwood used any force against Plaintiff, let alone excessive

8    force.  Volunteer Smallwood is entitled to summary judgment on

9    this claim.  His motion is GRANTED.

10

11                   b.    Deputy Zyskowski.

12        Corser contends that Deputy Zyskowski used excessive force

13   when placing him in handcuffs.  The Fourth Amendment permits

14   police officer's "use of reasonable force during an arrest."

15   *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095

16   (9th Cir. 2006)(*citing Graham v. Connor*, 490 U.S. 386, 396 (1989)

17   ("the right to make an arrest or investigatory stop necessarily

18   carries with it the right to use some degree of physical coercion

19   or threat thereof to effect it")).

20                   When we analyze excessive force claims, our initial
                     inquiry is whether the officers' actions were
21                   "objectively reasonable" in light of the facts and
                     circumstances confronting them.  We consider the facts
22                   underlying an excessive force claim from the
                     perspective of a reasonable officer on the scene,
23                   without regard to the arresting officer's subjective
                     motivation for using force. Whether a particular use of
24                   force was "objectively reasonable" depends on several
                     factors, including the severity of the crime that
25

26        [19]    The Complaint also names Does 1 through 15 as
     defendants to this cause of action, but Plaintiff has pointed to
27   no evidence implicating additional persons.  The claims against
     the Doe defendants shall be dismissed.
28

> prompted the use of force, the threat posed by a
> suspect to the police or to others, and whether the
> suspect was resisting arrest.

*Id*. at 1095 (internal citations and quotations omitted).  Here,
however, there are disputes as to the nature and necessity of the
force involved.  According to Zyskowski, he was applying
handcuffs to Plaintiff when Corser began to move his shoulders
from side to side.  This prompted Zyskowski to grab Corser in a
bear hold, and the two fell to the ground.  Zyskowski Depo. at
59-76.

     In contrast, Plaintiff claims that he put up no resistance
and made no shoulder movements or other movements that could be
characterized as resisting arrest.  Corser Decl. at ¶19.  Rather,
Corser states:  "I was tackled to the ground when I was
submitting to being handcuffed.  Instead of a simple
procedure, I ended up being turned upside down, [sustaining]
shoulder bruises, knee bruises and medical injuries.  Corser Depo
at 230.  The audio recording of the arrest does not shed
definitive light on the parties' movements or the nature and/or
necessity of the force involved.  Plaintiff's sworn, opposing
version of the facts is sufficiently specific to create a dispute
as to material facts concerning whether excessive force was used.
As to Defendant Zyskowski, the motion for summary judgment is
DENIED.

               c.   The County.

     Plaintiff points to no evidence establishing municipal
liability under *Monell*, 436 U.S. at 694.  The County is entitled
to summary judgment on the excessive force claim.

                              44

1
2

      3.   <u>1983 Claim for First Amendment Retaliation Against</u>
               <u>the County, Keene, Tatum, Pazin, Blake, Smallwood,</u>
               <u>Zyskowski, Stone, Fillebrown, and Does 1 through</u>
               <u>35.</u>

3
4
5

    Plaintiff's Second Cause of Action alleges that all County

defendants are liable under section 1983 for retaliating against

him for exercising his First Amendment rights.

6
7
8
9

> To demonstrate retaliation in violation of the First
> Amendment, Plaintiff must ultimately prove first that
> Defendants took action that would chill or silence a
> person of ordinary firmness from future First Amendment
> activities.... [and] second ...that Defendants' desire
> to cause the chilling effect was a but-for cause of
> Defendants' action.

10
11
12
13
14

*Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 900-901 (9th

Cir. 2008)(internal citations and quotations omitted).   In the

First Amendment context, a court must "look through form[] to the

substance" of government conduct.   *White v. Lee*, 227 F.3d 1214,

1228 (9th Cir. 2000).

15
16

                a.   <u>Gloria Keene.</u>

17
18
19
20
21
22
23

    As to Defendant Gloria Keene, Plaintiff alleges that she

retaliated against him for exercising his First Amendment rights

on two occasions.   First, on May 6, 2004, Keene called Demetrios

Tatum and informed him that there was a disturbance at the MAC

Meeting.   As a result of this call, which was eventually relayed

to Sheriff Pazin, two Merced County Sheriff's Deputies were

dispatched to the meeting.

24
25
26
27

    According to one witness, when the first officer, Deputy

Zyskowski, arrived, he drove his vehicle up onto the grass in

front of the building.   Lopez Depo. at 108-109.   But, Plaintiff

did not witness this event.   He merely saw the police cruiser

28

parked in front of the building, with its motor running and
headlights on.  Corser Depo at 164.  Plaintiff found this to be
"strikingly intimidating." *Id*. at 166.  Plaintiff did not see
any officer brandish a weapon, nor did any officer talk to him
that night.  *Id*. at 165-66.  There is no evidence that the second
officer, Deputy Parrish, engaged in any conduct that could even
arguably be considered intimidating or threatening.

        There is nothing in the record suggesting that a reasonable
person would have been chilled from engaging in First Amendment
activities as a result of the Deputies' conduct on this evening,
nor does Plaintiff point to any authority suggesting that this
kind of conduct would chill or silence a person of ordinary
firmness from future First Amendment activities.  This case is a
far cry from those in which First Amendment retaliation claims
survive summary judgment.  *See e.g., White,* 227 F.3d at 1228
(standard met where HUD investigators conducted an eight month
investigation, directing plaintiffs to produce documents and
submit to depositions concerning their views and public
statements in opposition to a project); *Mendocino Envt'l Ctr. v.
Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999) (standard
met where FBI agents released false information linking political
activists to attempted bombings); *Pinard v. Clatskanie Sch. Dist.
6J*, 467 F.3d 755, 770 (9th Cir. 2006)(suspension of student
athletes from team after they spoke out about abusive coach
satisfied standard); *Skoog v. County of Clakamas*, 469 F.3d 1221,
1232 (searching plaintiff's office and seizing materials
satisfies standard).  Keene is entitled to summary judgment as to
the retaliation claim based on her conduct in connection with the

1   MAC meeting.  Her motion is GRANTED.

2        Next, Plaintiff asserts that Keene conspired with Larry

3   Gonzales and others to have Plaintiff fired from his job at the

4   PCDC in retaliation for his political positions and membership in

5   organizations that filed lawsuits against the County.  There is

6   some evidence suggesting that Keene told Larry Gonzales that she

7   was not pleased with Owens and Lopez and wanted to see them

8   removed from the PCDC board.  However, there is absolutely no

9   evidence that Keene ever mentioned Corser to Larry Gonzales, let

10  alone in a derogatory light.  Keene is entitled to summary

11  judgment as to the retaliation claim based on Plaintiffs'

12  termination.  Her motion is GRANTED.

13

14                    b.   Demetrious Tatum.

15        As to Defendant Demetrios Tatum, there is evidence that he

16  took a telephone call from Gloria Keene on May 6, 2004, during

17  which Keene reported a disturbance at the Planada Community

18  Center.  Tatum merely passed that message on to Sheriff Mark

19  Pazin, which resulted in the dispatch of Sheriff Department

20  deputies.  There is no evidence linking Tatum to any deliberate

21  act of First Amendment retaliation.  He simply responded to a

22  disturbance report and sought law enforcement assistance.  He is

23  entitled to summary judgment on this claim.  His motion is

24  GRANTED.

25

26                    c.   Mark Pazin.

27        Defendant Sheriff Mark Pazin received the telephone call

28  from Demetrios Tatum on the evening of May 6, 2004 and directed

                              47

his staff to dispatch a unit to the possible disturbance.   There is absolutely no evidence, however, that Pazin had any other knowledge, motive, or did anything other than respond to a distress (public disturbance) call for assistance placed by a County Supervisor.  He is entitled to summary judgment on this claim.  His motion is GRANTED.

### d.   Bill Blake.

As to Defendant Undersheriff Bill Blake, there is no evidence suggesting he undertook any unlawful activities.  He is entitled to summary judgment on this claim.  His motion is GRANTED.

### e.   Deputies Zyskowski and Parrish's Conduct at the MAC Meeting.

Defendants Zyskowski and Parrish were dispatched to the Planada Community Center to determine if there was a disturbance at the MAC meeting on May 6, 2004.  This claim fails as a matter of law because Plaintiff has produced no evidence that suggests a "person of ordinary firmness" would be deterred from future First Amendment activities by the Deputies' conduct on that evening. Moreover, there is no evidence that either of the Deputies knew that Plaintiff had previously engaged in any First Amendment conduct that might motivate or invite retaliation.  Finally, there is no evidence that Deputy Parrish engaged in any even arguably threatening or intimidating conduct at all.

Both Zyskowski and Parrish are entitled to summary judgment on this claim.  Their motion is GRANTED.

48

**f.  Volunteer Smallwood's Conduct on the Night of Plaintiff's Arrest.**

There is no evidence that Volunteer Smallwood knew Plaintiff had engaged in any First Amendment conduct that might serve as a motivation for retaliation.  Smallwood is entitled to summary judgment on this claim.  His motion is GRANTED.

**g.  Deputy Zyskowski's Conduct on the Night of Plaintiff's Arrest.**

Shortly after the May 6, 2004 meeting, Plaintiff sent a letter of complaint to Sheriff Blake about the conduct of the Deputies Zyskowski and Parris that night.  Corser Decl. at ¶15. Blake informed Plaintiff that he spoke with all of the individuals involved about the complaint, including Deputy Zyskowski.  *Id*.  Plaintiff asserts that Zyskowski's decision to arrest him on June 24, 2004 was motivated by "vengeance on account of his being named in [the] earlier Citizen Complaint." Pltf's Ex. 1042 at 2 (Citizen Complaint).

The first question is whether the evidence, viewed in a light most favorable to Plaintiff, demonstrates that the action taken "would chill or silence a person of ordinary firmness from future First Amendment activities...."  *Dietrich*, 548 F.3d at 900.  In *Skoog*, 469 F.3d at 1232, the act of searching someone's office and seizing materials was deemed sufficiently chilling. Being placed under arrest is an even more significant intrusion and would likewise satisfy the standard.

The question then becomes whether the evidence is sufficient to demonstrate that "desire to cause the chilling effect was a but-for cause" of the arrest.  The Ninth Circuit recently applied

49

this test in *Dietrich*, 548 F.3d 901-902.  The Plaintiff in
Dietrich was a volunteer for a local political organization.  She
and other volunteers set up a petitioning and voter registration
table on a public sidewalk outside an event held in a public
area.  She was asked to leave the area by one of the event
organizers, who reasoned that, because the event permit covered
the sidewalk in question, it was no longer public.  *Id*. at 894-
95.  The group refused to leave, and the police were summoned.
*Id*. at 895.  An officer informed the group that, if they did not
move to another location, they would be arrested.  *Id*.  The
Officer then escorted the group off the sidewalk to another
location.  Id.

The day after being removed from the sidewalk, acting on
advice of counsel, the group returned to their original location
on the sidewalk and proceeded to gather signatures and
registrations there without incident.  That evening the incident,
the local newspaper ran a front page article entitled "Victorian
stage for petition standoff:  Group seeking petition signatures
and registering voters forced to leave city street."  *Id*.

The next day, Plaintiff drove her truck back to the
location, loaded with the organization's signs and materials.
*Id*.  In order to reach the location, she had to pass by a
barricade with a "road closed" sign.  The event organizer and a
different police officer approached Plaintiff after she arrived
at the location.  The officer cited her for failing to obey a
traffic device, despite her explanation that a fire officer had
allowed her to pass the barricade.  *Id*.

The Ninth Circuit rejected her claim of first amendment

retaliation.

> Plaintiff cannot establish causation. Her only theory is that Defendants read the newspaper article and cited her because of it (and not because she drove past a police barricade with a "road closed" sign on it). But there is no evidence that Defendants read the newspaper article. Plaintiff did not testify at her deposition that any of the Defendants mentioned it during the incident. She did not depose Defendants to ask them whether they had read the article, let alone whether they cited her because of it.

> Furthermore, Defendant Potter plainly had probable cause to cite Plaintiff: She does not dispute that she drove past the police barricade. Although she challenged the citation in municipal court, that court convicted her and the appellate court upheld the conviction.

*Id.* at 901.   The Ninth Circuit ruled that, under the

circumstances, "the fact that Defendants had probable cause is

not dispositive. But it undoubtedly has high probative force."

*Id.* (citing *Hartman v. Moore*, 547 U.S. 250, 265 (2006)).   The

Ninth Circuit then balanced the evidence of probable cause

against the evidence of retaliatory motive:

> In *Skoog*, we held that the retaliatory First Amendment claim survived summary judgment when there was barely enough evidence to conclude that there was probable cause, while there was strong evidence of a retaliatory motive. *See* 469 F.3d at 1231 (holding that, "[a]lthough it is a close question, we conclude that" sufficient evidence existed to support a finding of probable cause); *id.* at 1225-26 (recounting the strong circumstantial evidence of retaliatory motive). Especially given the importance of "protecting government officials from the disruption caused by unfounded claims," *id.* at 1232, this case-which has very strong evidence of probable cause and very weak evidence of a retaliatory motive-falls outside the reach of *Skoog*. <u>Importantly, if it did not, then nearly every retaliatory First Amendment claim would survive summary judgment</u>. There is almost always a weak inference of retaliation whenever a plaintiff and a defendant have had previous negative interactions; holding that this case survives summary judgment would provide almost no "protect[ion for] government officials from the disruption caused by unfounded claims." *Id.*

51

> We conclude that no reasonable juror could find from
> the undisputed facts that Defendants acted in
> retaliation for Plaintiff's First Amendment activities
> when Officer Potter gave her a traffic citation. We
> therefore affirm the district court's summary judgment
> to all Defendants on this claim.

*Id.* at 901-902 (emphasis added).

A similar result is appropriate here.  The evidence
supporting a finding of probable cause is undisputed and strong.
In contrast, the evidence supporting the existence of a
retaliatory motive is weak.  Plaintiff does not point to
deposition testimony suggesting that Zyskowski remembered his
Citizen complaint or that he was motivated by it in any way.
Zyskowski is entitled to summary judgment on this claim.  His
motion is GRANTED.

### h.   Ruth Stone

There is no evidence that Ruth Stone took any action in her
role as the chair of the MAC that could even arguably constitute
First Amendment Retaliation.  Any involvement she might have had
in Plaintiff's termination was related to her private conduct as
a member of the board of the PCDC.  Because Plaintiff cannot
establish state action as to Stone's conduct as a member of the
PCDC board, she is entitled to summary judgment on this claim.
Her motion is GRANTED.

### i.   Paul Fillebrown.

Defendant Paul Fillebrown, the Public Works Director,
recommend to the Board of Supervisors that someone other than the
PCDC should be the appropriate recipient of the lease.  Plaintiff

52

has not pointed to any evidence suggesting Mr. Fillebrown or his staff participated in a conspiracy to violate his rights.  Such a communication is also privileged, as Fillebrown in his official capacity had an absolute rigth to comment on and recommend a lessee.  He is entitled to summary judgment on this claim.  His motion is GRANTED.

> **4.   State Law Claims for Assault, Battery, and Use of Excessive Force Against Smallwood and Zyskowski.**

> **a.   Volunteer Smallwood.**

There is no evidence suggesting Volunteer Smallwood used any force against Plaintiff.  He is entitled to summary judgment on this claim.  His motion is GRANTED.

> **b.   Deputy Zyskowski.**

Deputy Zyskowski was entitled to use reasonable force to effect a valid arrest or to overcome resistance.  Here, however, there are disputes as to the validity of the arrest and the nature and necessity of the force involved.  As to Defendant Zyskowski, the motion for summary judgment on this claim is DENIED.

> **5.   False Arrest, False Imprisonment Against the County, Zyskowski and Smallwood.**

The County argues that it, Zyskowski, and Smallwood are entitled to summary judgment for the same reasons they are entitled to judgment in the federal wrongful arrest claim brought under § 1983.  As discussed, Volunteer Smallwood did not place Corser under arrest or act to detain him in any way.  Upon making

1
2
3
contact with Corser, he simply asked Corser to wait for a few
seconds while Deputy Zyskowski approached.  There is no basis for
a false imprisonment claim against Smallwood.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
     "The elements of a tortious claim of false imprisonment are:
(1) the nonconsensual, intentional confinement of a person, (2)
without lawful privilege, and (3) for an appreciable period of
time, however brief."  *Lyons v. Fire Ins. Exchange*, 161 Cal. App.
4th 880, 888 (2008).  Zyskowski argues that he is entitled to
qualified immunity in connection with the False Arrest/False
Imprisonment claim.  Doc. 114 at 22.  He cites no authority for
the proposition that the doctrine of qualified immunity applies
to a state law claim for false arrest or false imprisonment.
However, a California statutory immunity provides that there
"shall be no civil liability on the part of, and no cause of
action shall arise against, any peace officer ... acting within
the scope of his or her authority, for false arrest or false
imprisonment arising out of any arrest...[where] [t]he arrest was
lawful, or the peace officer, at the time of the arrest, had
reasonable cause to believe the arrest was lawful."  Cal. Penal
Code § 847 (b)(1); *see also Hamilton v. City of San Diego*, 217
Cal. App. 3d 838, 844 (1990).

22
23
24
25
26
27
     Here, the undisputed evidence supports the conclusion that
Zyskowski had reasonable cause to believe his arrest of Corser
was lawful.  Plaintiff offers no basis for an independent false
arrest/false imprisonment claim against the County.  Zyskowski
and the County's motion for summary judgment on this claim is
GRANTED.

28

54

**6.  California Civil Code § 52.1 Claim Against All
County Defendants.**

California Civil Code § 52.1 prohibits interference with
Constitutional or statutory rights by way of intimidation, or
coercion.  *Austin B. v. Escondido Union School District*, 57 Cal.
Rptr. 3d 454 (2007).  The act requires "[1] an attempted or
completed act of interference with a legal right, accompanied by
[2] a form of coercion."  *Jones v. Kmart Corp.*, 17 Cal. 4th at
334.  The undisputed evidence indicates that, with the exception
Deputy Zyskowski, no County defendant engaged in any attempted or
completed act of interference with Plaintiff's legal rights.
However, the survival of Plaintiff's section 1983 excessive force
claim against Deputy Zyskowski naturally entails the survival of
a parallel section 52.1 claim against Zyskowski.  The elements of
a section 52.1 excessive force claim are essentially identical to
those of a section 1983 excessive force claim.  *See Edson v. City
of Anaheim*, 63 Cal. App. 4th 1269, 1273 (1998); *cf. City of Simi
Valley v. Superior Court*, 111 Cal. App. 4th 1077, 1085 (2003)
(where federal constitutional claims are barred, and there is no
conduct constituting a state constitutional violation, there is
no basis for liability under section 52.1).  The County's motion
for summary judgment on the section 52.1 claim is GRANTED as to
all defendants except Deputy Zyskowski.


**7.  Negligent Training and Supervision Against the
County, Pazin and Blake.**

Plaintiffs' sixth cause of action purports to be a <u>state law</u>
claim for negligent training and supervision against the County,
Pazin and Blake.  Under California law, to establish a claim of

55

negligent supervision, a plaintiff must prove the traditional elements of actionable negligence, *Thompson v. Sacramento City Unified School Dist.*, 107 Cal. App. 4th 1352, 1372 (2003), including duty, breach, and causation.  Plaintiff has not produced any evidence indicating that failure to train and/or supervise any County employee resulted in harm to him.  The County's motion for summary judgement as to the negligent training and supervision claim is GRANTED.

### 8.   Conspiracy to Violate Constitutional Rights Against All County Defendants

To establish the existence of a conspiracy, a plaintiff must show "an agreement or 'meeting of the minds'" to violate his constitutional rights.  *Ward* v. EEOC, 719 F.2d 3311, 314 (9th Cir. 1983).  Here, for all the reasons stated above, there is no evidence linking any County actor to a conspiracy to violate Plaintiffs' constitutional rights.  The only County official who had any interaction or alleged interest in Plaintiff is Ms. Keene.  There is no evidence she agreed with any other person to violate Plaintiff's rights.  The motion for summary judgment on this claim is GRANTED as to all County Defendants.

### III.   CONCLUSION

For the reasons set forth above:

(1) Larry Gonzales' motion for summary judgment is GRANTED IN ITS ENTIRETY;

(2) Maria Gonzales' motion for summary judgment is GRANTED IN ITS ENTIRETY.

56

1
2
3
4
5
6
7

(3) The County's motion for summary judgment is granted as to all claims against all defendants with the exception of the section 1983 excessive force claim against Deputy Zyskowski, the state law claim for assault, battery, and use of excessive force against Deputy Zyskowski, and the related claim under California Civil Code section 52.1 against Deputy Zyskowski.  Disputes as to material facts preclude summary judgment on those three claims.

8

(4) All claims against all Doe defendants are DISMISSED.

9
10

SO ORDERED

11

DATED:   January 26, 2009

12
13
14

_____/s/ Oliver W. Wanger_____
Oliver W. Wanger
United States District Judge

15
16
17
18
19
20
21
22
23
24
25
26
27
28